**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **Houshang Momenian,** *et al.* ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Civil No. 1:15-cv-00828 (APM)** |
| ) | |
| **Michael M. Davidson,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

**I.   INTRODUCTION**

Plaintiffs Houshang Momenian and Vida Momenian have filed suit against their former lawyer, Defendant Michael Davidson, for legal malpractice and breach of fiduciary duty. Plaintiffs allege that Defendant negligently represented them in connection with a D.C. Superior Court case that they filed on August 18, 2009, and later dismissed with prejudice on October 10, 2010, as part of a settlement agreement. Plaintiffs assert that Defendant negligently advised them to settle their claims. Defendant has moved to dismiss their Complaint. Because the court concludes that Plaintiffs' claims are time-barred, it grants Defendant's Motion to Dismiss.

**II.   BACKGROUND**

**A.   Factual Background**

*1.   The Relevant Real Estate Transactions*

Plaintiffs are a husband and wife who, either directly or as beneficiaries of a trust, own real property in the District of Columbia. Compl., ECF No. 1-1, ¶ 6. In 1990, Plaintiffs purchased three adjacent properties, located in Southeast Washington, D.C. (the "Southeast Properties"),

from Paul and Amelia Interdonato (the "Interdonatos"). In exchange for the Southeast Properties, Plaintiffs executed a $265,000 promissory note payable to Paul Interdonato (the "Promissory Note"), which was secured against the three properties by a Deed of Trust Note. *Id.* ¶ 7.

Plaintiffs claim that the proceeds of four real estate transactions that occurred between 1997 and 2002 should have been credited toward satisfying the Promissory Note. First, in late 1997 or early 1998, Plaintiffs contracted to sell another property that they owned on Georgia Avenue, N.W. (the "Georgia Avenue Property"), but the sale fell through. *Id.* ¶ 8. Plaintiffs assert that the forfeited deposit on the unsuccessful sale, in the amount of $10,000, was transferred to the Interdonatos and should have been applied to the balance due on the Promissory Note. *Id.*

Second, later in 1998, Plaintiffs assigned their interest in the Georgia Avenue Property to the Interdonatos, who eventually foreclosed on the property in June 1999. *Id.* ¶¶ 10-11. Several months later, the Interdonatos sold the Georgia Avenue Property for $120,000. *Id*. ¶ 11. According to Plaintiffs, the Interdonatos agreed that over $78,000 from the proceeds of the sale would be applied toward the balance due on Plaintiffs' Promissory Note. *Id.* No such credit was given, however. *Id.*

Third, in late 1998, Plaintiffs sold the Southeast Properties to Emmebet Fikru and Tesfay Guebre (collectively "Fikru"). The transaction's details are difficult to follow. But it seems that, as part of the sale transaction, the Interdonatos agreed to release their first position on the Deed of Trust Note on the Southeast Properties in exchange for a lump-sum payment of nearly $30,000; a new $100,000 promissory note from Fikru (the "Fikru Note"); and second position on the Deed of Trust Note. *Id.* ¶¶ 12-15. According to Plaintiffs, the nearly $30,000 lump-sum payment (the "30,000 Lump Sum Payment") should have been credited against the outstanding amount they owed the Interdonatos. *Id.* ¶ 14.

In December 2001, Fikru sought to sell two of the three Southeast Properties. *Id.* ¶ 17. The Interdonatos agreed to the sale on the condition that the Fikru Note be secured by a first position on the deed of trust for the remaining third property. *Id.* While this was being arranged, in January 2002, Plaintiffs and the Interdonatos "entered into a Note Modification Agreement in which it was agreed that, after the application of certain adjustments, Plaintiffs' outstanding indebtedness to the Interdonatos was at the time $141,898.47." *Id.* ¶ 18. Under that Agreement, Plaintiffs were to pay off the Promissory Note at a rate of $1,300 per month starting in January 2002. *Id.* Several months later, in June 2002, Fikru's sale of two of the Southeast Properties became final. *Id.* ¶ 19. According to Plaintiffs, Fikru was to have paid $50,000 of the sale proceeds to the Interdonatos as part of that transaction. *Id.* Plaintiffs assert that this fourth and final sale proceed also should have been credited to the balance left on Plaintiff's Promissory Note, but was not. *Id.*

According to Plaintiffs, from January 2002 to November 2012, they "faithfully and regularly" made the required $1,300 per month payment due under the Note Modification Agreement. *Id.* ¶ 20. Over that period, they made 152 payments totaling $197,600. *Id.*

2.   *The D.C. Superior Court Litigation*

On August 18, 2009, Plaintiffs filed a lawsuit in D.C. Superior Court against the Interdonatos (the "D.C. Lawsuit"). *Id.* ¶ 21. Their lawyer was Defendant Michael Davidson. The D.C. Lawsuit alleged that the Interdonatos wrongfully had failed to apply at least $90,000 in proceeds from the above-described four transactions against the outstanding balance on the Promissory Note. *Id.* ¶ 23. During the litigation, Plaintiffs claimed that they repeatedly asked Defendant to hire an accountant, or seek court appointment of one, to analyze and compute the amounts the Interdonatos should have credited to Plaintiffs, but Defendant failed to do so. *Id.* ¶ 24.

On October 12, 2010, based on Defendant's advice, Plaintiffs settled the D.C. Lawsuit for a credit of $15,000 against their outstanding debt on the Promissory Note. *Id.* ¶ 26. According to the Complaint: "On that date, Houshang [Momenian] and Defendants executed a Praecipe stating that '[T]he Clerk of said Court will dismiss *with prejudice* this action. Defendants agree to credit $15,000 to Plaintiffs' Promissory Note Modification Agreement effective October 12, 2010.'" *Id.* ¶ 26.

Notwithstanding the plain text of the Praecipe, Plaintiffs now allege that they understood the settlement to have resolved only one of the four allegedly unapplied credits—the $30,000 Lump Sum Payment. *Id.* ¶ 27. As for the remaining three credits, Plaintiffs "understood that [those] aspects of [their] claim . . . would be referred to the Court and/or a Court-appointed accountant." *Id.* ¶ 28. Plaintiffs contend that, because Defendant was negligent in explaining the scope and preclusive effect of the settlement, they did not appreciate that a "dismissal with prejudice meant that there would be no future litigation over Plaintiffs' claim that other amounts should have been credited by the Interdonatos." *Id.*

After the settlement, Plaintiffs continued to make payments of $1,300 per month toward the Promissory Note, as required under the Note Modification Agreement. *Id.* ¶ 28. According to Plaintiffs, "[a]s of May 2012 they believed they were in full compliance with their obligations under that Agreement and that, if anything, they had overpaid Plaintiffs' Note." *Id.*

On some date before May 7, 2012, Plaintiffs conveyed their title to the remaining Southeast Property to a trust known as the Houshang Momenian Revocable Trust ("Houshang Trust").[1] *Id.* ¶ 29. Then, on May 7, 2012, the Interdonatos issued a Notice of Foreclosure against the Houshang Trust, asserting that Plaintiffs owed approximately $240,000 on the Promissory Note and that

---

[1] Although not detailed in the Complaint, it appears that Fikru transferred the third Southeast Property to the Plaintiffs at some point before May 2012. *See* Compl. ¶¶ 12, 29.

4

Plaintiffs were in default. *Id.* ¶ 30. The parties thereafter litigated the matter. *Id.* ¶ 31. With the assistance of a new lawyer, Plaintiffs settled the matter by agreeing to pay the Interdonatos $85,000 in full and final satisfaction of the Promissory Note. *Id.* ¶ 32.

### B. Procedural History

On May 6, 2015, nearly three years to the day that the Interdonatos issued the Notice of Foreclosure, Plaintiffs filed suit in D.C. Superior Court against Defendant, asserting claims of legal malpractice and breach of fiduciary duty.[2] *See generally* Compl. On June 6, 2015, Defendant removed the case to this court. Notice of Removal, ECF No. 1.

Defendant then moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). He argued that (1) Plaintiffs had failed to allege negligence or wrongdoing; (2) they had failed to allege injury because they had transferred their property interest to the Houshang Trust; and (3) their claims were time-barred. *See generally* Mot. to Dismiss, ECF No. 7.[3]

## III. STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(6), the court must accept a plaintiff's factual allegations as true and "construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). The court need not accept as true "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "inferences . . . unsupported by the

---

[2] Because the legal malpractice and breach of fiduciary duty claims are essentially the same in this case, the Memorandum Opinion's references to the legal malpractice claim should be read to apply equally to the breach of fiduciary duty claim.

[3] As explained below, the court concludes that Plaintiffs claims are barred by the applicable statute of limitations. The court, therefore, does not reach Defendant's other arguments.

5

facts set out in the complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations in the complaint need not be "detailed"; however, the Federal Rules demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* If the facts as alleged fail to establish that a plaintiff has stated a claim upon which relief can be granted, a court must grant defendant's Rule 12(b)(6) motion. *See Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

Generally, courts are discouraged from granting motions to dismiss based on an expired limitations period. *See Richards v. Mileski*, 662 F.2d 65, 73 (D.C. Cir. 1981) ("There is an inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense."). That is "because statute of limitations issues often depend on contested questions of fact[.]" *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). Dismissal therefore is appropriate "only if the complaint on its face is conclusively time-barred." *Id.* The court keeps these principles in mind when evaluating Plaintiffs' allegations under the applicable three-year statute of limitations. *See* D.C. Code § 12-301(8) (2016); *Duggan v. Keto*, 554 A.2d 1126, 1143-44 (D.C.

1989) (applying three-year limitations period under D.C. Code § 12-301(8) to both legal malpractice and breach of fiduciary duty claims).[4]

## IV. DISCUSSION

Whether a claim is time-barred typically turns on the date that the claim started to accrue. Yet establishing the date of accrual is not always a straightforward matter. Such is the case here. Defendant argues that Plaintiffs' claims began to accrue no later than October 12, 2010, when Plaintiffs executed and filed the Praecipe in Superior Court that noticed dismissal of the D.C. Lawsuit "with prejudice." Mot. to Dismiss at 12 (quoting Compl. ¶ 26). At that point in time, Defendant asserts, Plaintiffs would have known that they had voluntarily and permanently relinquished all of their claims, and therefore their suit filed more than four-and-a-half years later was time-barred. *Id.* at 12-13. Plaintiffs, on the other hand, invoke the "discovery rule" and argue that their claims did not start to accrue until they actually became aware of Defendant's misconduct and the injury that flowed from it. That first occurred, Plaintiffs argue, on May 7, 2012, when the Interdonatos issued the Notice of Foreclosure. Opp'n to Mot. to Dismiss, ECF No. 10, at 12 [hereinafter Opp'n]. Thus, they contend, their suit filed on May 6, 2015, was timely. *Id.*

Under District of Columbia law, the "injury" rule generally applies to malpractice claims and breach of fiduciary duty claims against lawyers. *See generally Diamond v. Davis*, 680 A.2d 364, 366, 379-80 (D.C. 1987) (per curiam); *Byers v. Burleson*, 713 F.2d 856, 859-60 (D.C. Cir. 1983). Under the injury rule, a claim begins to accrue when the plaintiff suffers actual injury, not when the act causing the injury occurs. *Byers*, 713 F.2d at 860; *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 995 n.5 (D.C. 1978). But where the "relationship between the fact of

---

[4] Because this is a diversity action, the court applies the limitations period under District of Columbia law. *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995).

injury and the alleged tortious conduct is obscure," the "discovery rule" applies instead. *Bussineau v. Pres. & Dirs. of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986).

Under the discovery rule, a claim does not begin to accrue until a person knows—"or by the exercise of reasonable diligence should know"—of (1) some injury; (2) its cause in fact; and (3) some evidence of wrongdoing. *Id.* at 426. Because the discovery rule adopts the standard of "inquiry notice," "[i]n every case, the plaintiff has a duty to investigate matters affecting her affairs with reasonable diligence under all of the circumstances." *Diamond*, 680 A.2d at 381; *Hendel v. World Plan Exec. Council*, 705 A.2d 656, 661 (D.C. 1997) ("The discovery rule does not . . . give the plaintiff *carte blanche* to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm."). Thus, accrual of a limitations period does not depend on a person's knowledge of all essential elements of a claim. *See Diamond*, 680 A.2d at 389 (Ferren, A.J., concurring in the result and dissenting in part). Once a person actually knows, or has reason to know, of some injury, its cause-in-fact, and some evidence of wrongdoing, then "she is bound to file her cause of action within the applicable limitations period, measured from the date of her acquisition of the actual or imputed knowledge." *Id.* at 381. These legal principles are well established in legal malpractice and professional breach cases under District of Columbia law. *See, e.g., Byers*, 713 F.2d at 859-60 (applying the "discovery rule" to legal malpractice claim); *Knight v. Furlow*, 553 A.2d 1232, 1233-34 (D.C. 1989) (affirming the rule in *Byers*); *Diamond*, 680 A.2d at 379-81.

Turning to the Complaint's allegations, Plaintiffs assert that they were injured in two ways—(1) by overpaying the Promissory Note and (2) by incurring additional attorney's fees, as well as accounting fees, to resolve outstanding legal disputes with the Interdonatos. Compl. ¶¶ 37-42. These injuries, they claim, arose from two types of professional breach committed by

Defendant. First, Plaintiffs allege that Defendant failed to explain to them that, by settling the D.C. Lawsuit "with prejudice," they had fully and finally released their claims against the Interdonatos. *Id.* ¶¶ 36(e)-(d). As a consequence of their unknowing release of claims, Plaintiffs contend, they overpaid the Interdonatos. Second, Plaintiffs contend that Defendant failed to adequately analyze and investigate their case against the Interdonatos. In particular, Plaintiffs allege that Defendant failed to secure a qualified accountant to correctly calculate the applicable credits and outstanding balance owed to the Interdonatos on the Promissory Note. *Id.* ¶¶ 36(a)-(c). As a result, Plaintiffs overpaid the Promissory Note and incurred additional legal and accounting costs while attempting to resolve their outstanding conflicts with the Interdonatos. Under either theory of professional malfeasance, Plaintiffs' claims are time-barred.

> 1. *Defendant's Alleged Failure to Inform Plaintiffs About the Effects of Dismissing the D.C. Lawsuit "With Prejudice"*

The court first addresses—and rejects—Defendant's assertion that because the Praecipe clearly provided for dismissal of Plaintiffs' claims against the Interdonatos "with prejudice," Plaintiffs' claims in this case accrued on October 12, 2010, when Plaintiffs dismissed the D.C. Lawsuit. Mot. to Dismiss at 10 (quoting Compl. ¶ 26). The D.C. Circuit has observed that a "layman may not always be aware when unsatisfactory conduct by his attorney will give rise to a malpractice action." *Williams v. Mordkofsky*, 901 F.2d 158, 162 (D.C. Cir. 1990). Accordingly, in *Byers v. Burleson*, the D.C. Circuit held that legal malpractice plaintiffs are afforded at least a "reasonable period of time" to investigate and determine whether their counsel engaged in malfeasance. *See* 713 F.2d at 862 (stating that "the statutory period did not begin to run when only a remote possibility existed that [the defendant] had been guilty of malpractice; nor was it tolled until [the plaintiff] amassed an airtight case of legal malpractice against [the defendant]").

Here, the words "with prejudice" are not so clear that the average person would understand what they mean when a lawyer uses them to notify the court of a settlement and the dismissal of a case. Plaintiffs could not be expected to know—based on the Praecipe alone—that dismissal "with prejudice" meant that they had forever released all of their claims asserted in the D.C. Lawsuit. Because "with prejudice" has a unique legal meaning, Plaintiffs had a "reasonable period of time" after the Praecipe's filing before their professional malpractice claims against Defendant started to accrue. Thus, the claims did not start to accrue on October 12, 2010.

Yet Plaintiffs also incorrectly state the date of accrual. They contend that their claims began to accrue on May 7, 2012—the day on which the Interdonatos issued a Notice of Foreclosure against the Houshang Trust and declared Plaintiffs in default. Opp'n at 12. If Plaintiffs had exercised reasonable diligence, as the "discovery rule" requires, they would have learned about the settlement's full scope and preclusive effect well before May 7, 2012.

Plaintiffs allege that, because of Defendant's professional misconduct, they understood that their 2010 settlement resolved only one of the four claimed credits—the $30,000 Lump Sum Payment—and that, as to the other three credits, their claims "would be referred to the Court and/or a Court-appointed accountant." Compl. ¶ 27. That allegation strikes the court as improbable. But assuming it to be true, as the court must, Plaintiffs had an obligation to inquire about the status of the claims that supposedly remained pending before the Superior Court. *See Diamond*, 680 A.2d at 381 (emphasizing that, "[i]n every case, the plaintiff has a duty to investigate matters affecting her affairs with reasonable diligence under all of the circumstances").

Even by their own account, however, Plaintiffs exercised no such diligence. Plaintiffs assert that "they *first became aware of the problem* [with Defendant's advice about the settlement] when Mr. Interdonato issued his Notice of Foreclosure on May 7, 2012." Opp'n at 12 (citing

10

Compl. ¶ 30) (emphasis added). Plaintiffs thus concede that, during the 18-month period between settlement of the D.C. Lawsuit (October 10, 2010) and the outside boundary of the three-year limitations period (May 6, 2012), they did not make any inquiry about the allegedly surviving claims. Plaintiffs could have asked Defendant about the status of those claims. They could have asked another lawyer to look into the matter. Or they could have checked the court records themselves. *See Drake v. McNair*, 993 A.2d 607, 618-19 (D.C. 2010) (holding that plaintiff was on inquiry notice of her claims based on the existence of public land records that contained the facts relevant to her claims); *In re Estate of Delaney*, 819 A.2d 968, 982 (D.C. 2003) (holding that the plaintiff's claims were time-barred where, although she had suspicions about a will's authenticity, she did not make a "reasonable, prompt, and diligent inquiry" into the matter); *Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 110 (D.D.C. 2002) (holding that the plaintiffs' claims had expired where "[t]wo matters of public record . . . provided inquiry, if not actual, notice to the plaintiffs"). According to their Complaint, Plaintiffs did none of those things.

If they had exercised reasonable diligence, Plaintiffs would have learned before May 6, 2012—*i.e.*, more than three years before they filed suit—that the claims relating to the remaining three credits were not in fact "referred to the Court and/or a Court-appointed accountant." Compl. ¶ 27. From a basic inquiry, Plaintiffs would have learned that (1) their lawyer had engaged in wrongdoing, *i.e.*, he had misadvised them about the settlement's scope and preclusive effect; (2) they had suffered injury resulting from that misconduct, *i.e.*, they in fact had fully and finally released all of their claims, meaning the other three credits would not be applied against the balance on the Promissory Note; and (3) their lawyer's conduct was the cause of their injury, *i.e.*, their lawyer's wrong advice had caused them to give up claims about the other credits and to overpay the Interdonatos.

In short, although the court cannot precisely fix the date of accrual, under the discovery rule the limitations period unquestionably commenced more than three years before Plaintiffs filed suit. Plaintiffs' claims based on Defendant allegedly misleading them about the scope and preclusive effect of the settlement therefore are time-barred.

        2.    *Defendant's Alleged Failure to Adequately Investigate Plaintiffs' Claims*

The same conclusion pertains to Plaintiffs' second allegation of professional misconduct, which claims that Defendant did not adequately investigate Plaintiffs' claims before recommending settlement. In particular, Plaintiffs assert, Defendant's failure to retain an accountant was negligent. Plaintiffs, however, did not allege their claim in time.

Plaintiffs concede that they knew *before* settling the D.C. Lawsuit that Defendant had not retained an accountant. *See* Compl. ¶ 25 (alleging that, despite their "repeated requests," Defendant failed to hire an accountant or seek court appointment of one). And, as discussed above, they had ample time after the Praecipe's filing, but before the outside boundary of the three-year limitations period, to discover their injury. Indeed, Plaintiffs aver that "[a]s of May 2012 they believed they were in full compliance with their obligations under [the Note Modification Agreement] and that, if anything, they had *overpaid* Plaintiffs' Note." Compl. ¶ 28 (emphasis added). Plaintiffs thus concede that, more than three years before they filed their Complaint, they knew that they possibly had been injured through overpayment of the Promissory Note.

These facts are sufficient to establish that Plaintiffs knew, or should have known with reasonable diligence, all the facts needed to trigger accrual of their claims before May 6, 2012. They knew that: (1) Defendant had performed deficiently, *i.e.*, he had failed to secure an accountant's services; (2) they had suffered injury, *i.e.*, they likely had overpaid the Interdonatos on their Promissory Note; and (3) Defendant was the cause-in-fact for their injury, *i.e.*, his failure

to secure an accountant resulted in an disadvantageous settlement and their overpayment on the Promissory Note.  Thus, based on Plaintiffs' own allegations, it is clear that the limitations period began to accrue more than three years before Plaintiffs filed suit.  Plaintiffs' claims regarding Defendant's inadequate performance in the D.C. lawsuit thus are also time-barred.

### 3. Plaintiffs' Lulling Claim

In addition to relying on the discovery rule to support their claims, Plaintiffs also argue that Defendant "ought not to be able to invoke the protection of the statute of limitations" when he "lull[ed] the client[s] into a false sense of security."  Opp'n at 12.  The court understands Plaintiffs to argue that the start of the limitations period was tolled because Defendant had "lulled" Plaintiffs into not bringing suit.  Under District of Columbia law, "a defendant cannot assert the bar of the statute of limitations, if it appears [the defendant] has done anything that would tend to lull the plaintiff into inaction, and thereby permit the limitation prescribed by the statute to run."  *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C. 1986) (citation and internal quotation marks omitted).  For the "lulling" doctrine to apply, however, the defendant "must have done something that amounted to an *affirmative inducement* to plaintiffs to delay bringing action."  *Id.* (citation omitted) (emphasis added).

Here, Plaintiffs' Complaint lacks any factual averment to support their lulling assertion.  Plaintiffs allege only that Defendant "fail[ed] to explain" or "did not adequately explain" the preclusive effect of the Praecipe and the meaning of the phrase "with prejudice." Comp. ¶¶ 27, 36(d)-36(e).  Those acts or omissions are alleged to have occurred only in connection with the settlement.  *Id.*  Plaintiffs make no allegation that, *after* the settlement, Defendant did anything to

13

affirmatively induce them not to bring a claim. Therefore, the lulling doctrine cannot save Plaintiffs' untimely claims.[5]

## V.  CONCLUSION AND ORDER

For the foregoing reasons, Defendant's Motion to Dismiss is granted and Plaintiffs' Complaint is dismissed without prejudice. The court, however, will not dismiss the action itself at this time. *See Ciralsky v. CIA*, 355 F.3d 661, 666-67 (D.C. Cir. 2004) (distinguishing between dismissal of the complaint and dismissal of the action or case). The court will afford Plaintiffs 21 days from this date to file an amended complaint that endeavors to allege timely claims.[6] If Plaintiffs do not file an amended complaint within that time period, the court will enter a final, appealable order dismissing this case.

Dated: January 21, 2016

Amit P. Mehta
United States District Judge

---

[5] Plaintiffs have not argued that the "continuous representation rule" applies. Under that rule, a malpractice claim "will not accrue until the representation is terminated, even though the client's knowledge might otherwise have triggered the statute earlier." *Hillbroom v. Pricewaterhouse Coopers LLP*, 17 A.3d 566, 573 (D.C. 2011) (internal quotation marks and citation omitted). The court thus does not address the issue.

[6] If Plaintiffs file an amended complaint, Defendant again may move to dismiss under Rule 12(b)(6), including on those grounds advanced in their original Motion to Dismiss which the court has not addressed in this Memorandum Opinion.